## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **EDWARD A. PERUTA**, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CASE NO: |
| | : | |
| v. | : | |
| | : | |
| **SLOAN GIBSON**, Acting Secretary of Veterans Affairs, | : | |
| **MICHAEL F. MAYO-SMITH, M.D.**, M.P.H., Network | : | |
| Director, VA New England Healthcare System, | : | |
| **MICHAEL EBERT, M.D.**, Chief of Staff, | : | |
| VA Connecticut Healthcare System, | : | |
| **VINCENT W. NG, M.D.**, Medical Center Director, | : | |
| VA Boston Healthcare System, | : | |
| **JEFFREY S. LUSTMAN, M.D.**, VA Connecticut | : | |
| Healthcare System, **SUSAN DICKER, R.N.**, VA | : | |
| Connecticut Healthcare System, | : | |
| **NANCY KATZ-JOHNSON,** Chief Privacy Officer, VA | : | |
| Connecticut Healthcare System, | : | |
| **DALE GAUDIO,** Chief, Business Office, VA Connecticut | : | |
| Healthcare System, | : | |
| | : | |
| Defendants. | : | DECEMBER 22, 2016 |

## COMPLAINT

1.  This case is brought, pursuant to the Federal Tort Claims Act, the Fourteenth Amendment to the United States Constitution, and common law tort claims, by a 100% service-connected disabled Vietnam Veteran with Post-Traumatic Stress Disorder to redress the unlawful denial of the Veteran's entitlement to fee basis medical care without notice or opportunity for hearing and in the absence of a medical justification.

## JURISDICTION AND PARTIES

2.  Plaintiff Edward A. Peruta ("Veteran") is a resident of Connecticut, California, and Florida.

3.      Defendant United States of America, through its agency, the Department of Veterans Affairs (VA), operates the Veterans Affairs Medical Centers in Newington and West Haven, Connecticut.

4.      Defendant United States of America, including its directors, officers, operators, administrators, employees, agents, and staff of the VA New England Healthcare System are hereby referred to as the VA.

5.      At all times relevant to this Complaint, the VA held itself out to the Veteran and eligible beneficiaries, as a provider of high quality health care and fee basis reimbursement, with the expertise necessary to maintain the health and safety of Veterans.

6.      At all times relevant to this Complaint, the directors, officers, operators, administrators, employees, agents, and staff were employed by and/or acting on behalf of the VA. Furthermore the VA is responsible for the negligent acts of their employees and agents under respondent superior.

7.      Jurisdiction is proper under 28 U.S.C. § 1346(b)(1), 28, U.S.C. § 2401(b), 28 U.S.C. § 2671, et seq., and 28 U.S.C. § 1367.

8.      The Veteran has fully complied with the provisions of 28 U.S.C. § 2675 of the Federal Tort Claims Act and received a final denial of his notice of claim on June 22, 2016.

**ALLEGATIONS OF FACT**[1]

A.      The Veteran's History of VA Care

9.      The thirty-eight (38) year history of the Veteran's contacts with the VA Healthcare System demonstrate his continued need for non-VA healthcare services.[2]

---

[1] The Veteran submits his Affidavit, and an Affidavit of his wife, Lois Peruta, in an Appendix including also: (1) twenty-seven (27) relevant VA records; (2) email communications; and (3) documents prepared by or on behalf of the Veteran.

10.     The Veteran has never chosen nor been assigned a primary care physician at a VA healthcare facility due to: (1) the deficient care he has received at such facilities; (2) the disposition of VA medical providers and staff toward the Veteran; and (3) the stress impact of (1) and (2) upon the Veteran's symptomatic, service-connected PTSD total and permanent 100% disability.  (Pet. App. at A143-A179)

11.     The relationship between the Veteran and the VA Healthcare System is documented, expressly, in a chain of 2002 emails demonstrating the derisive attitude of VA medical providers, staff, and fiscal officers toward the Veteran.  (Pet. App. at A20-A27)

12.     Eight years subsequent to these emails, on October 29, 2010, when the Veteran sought assistance from the VA Connecticut Healthcare System (VACHS) to clarify his fee basis status he was misled and targeted by the VA Police Service as an unwelcome, ostracized, intruder on VA property, even by the Patient Advocate Supervisor Bernadette Kern ("PAS Kern") whose duty it was to assist the Veteran.  (Pet. App. at A43, A44, A45, A68-A71, A72-A73, A74-A84, A191-A192)

13.     As documented in the October 29, 2010, VA Police Service Journal, the police responded to a call from PAS Kern not only regarding the Veteran's intent to file a Petition for Extraordinary Relief with the U.S. Court of Appeals for Veterans Claims but regarding another veteran seeking assistance from PAS Kern.

14.     The second veteran reportedly became "irate" as a result of his failed attempts in seeking assistance from the Patient Advocate Supervisor.  (Pet. App. at A43)[3]

---

[2] 38 U.S.C. § 1703(a) provides in part:  "When Department facilities are not capable of furnishing economical hospital care or medical services because of geographical inaccessibility or <u>are not capable of furnishing the care or services required</u>, the Secretary, as authorized in section 1710 of this title, may contract with non-Department facilities in order to furnish any of the following … ."  (emphasis added).

[3] Issues and complaints by veterans about the VACHS are longstanding and still the VACHS presents the non-responsive PAS Kern to head its office tasked with providing veterans assistance.  (Pet. App. at A192, A193)

15.     The thirty-eight (38) year history of the VA Healthcare System's failures to earn the trust necessary for providing the Veteran primary care treatment and minimizing the stress associated with the Veteran's contacts with the VA Healthcare System is summarized next and detailed in the Veteran's Affidavit.  (Pet. App. at A143-A179)

16.     Such failures reflect upon the VA's capacity and willingness to provide required healthcare services to the Veteran.

17.     The November-December 2002 internal VA emails and the October 29, 2010, VA Police Service response corroborate the Veteran's feelings of distrust of the VA Healthcare System.

B.     Veteran's History of VA Healthcare System Contacts

18.     The Veteran served active duty in the United States Marine Corps from August 31, 1966, through August 27, 1969.   (Pet. App. at 143-A179)[4]

19.     In 1985, the VA awarded the Veteran 100% service-connected permanent disability for Post-Traumatic Stress Disorder (PTSD).[5]

20.     The Veteran's combined service-connected disability rating of 100% is based on the following conditions: (1) PTSD - 100%; (2) Tinnitus - 10%; (3) Clavicle or Scapula, Improvement - 10%; and (4) Impaired Hearing - 0%.  (Pet. App. at A4-A15)

1.     Pre-1986 Veteran Contacts with the VA

21.     In 1972, the Veteran was admitted to the Newington VA Medical Center (VAMC) for surgery to repair torn cartilage in the left knee.[6]

---

[4] The Veteran's history is contained in his Affidavit and an Affidavit submitted by the Veteran's wife, Lois Peruta. (Pet. App. at A143-A179 and A180-A188)
[5] Prior to 1985, the VA had rated the Veteran 10% service-connected disability for PTSD.
[6] The Veteran's medical history is supported by Affidavit.  (Pet. App. at A143-A179)  Despite repeated requests for assistance in obtaining his medical records, including a Notice of Disagreement filed on August 24, 2010, the VACHS has denied the Veteran his records.  (Pet. App. at A2, A3)

22.     When the Veteran continued to experience severe pain in 1973, he consulted with Dr. John F. Raycroft ("Dr. Raycroft"), an orthopedic surgeon based at Hartford Hospital, who then performed an operation on the same left knee to discover that the VA physicians had left behind a piece of cartilage resulting in the Veteran's severe pain and need for additional surgery.

23.     In 1981, a state trial court judge referred the Veteran to a VA center in Hartford for evaluation and mental health counseling.

24.     This evaluation resulted in a VA diagnosis of severe PTSD.   The Veteran unilaterally terminated the VA center counseling in 1982 and did not learn of this diagnosis until 1985 when he acquired the VA center records in the course of pursuing a compensation claim.

25.     In 1983, the Veteran relocated from Connecticut to Florida.   Prior to relocating, he underwent a formal medical board evaluation conducted by the United States Army at Fort Devens, Massachusetts, as part of a Line of Duty (LOD) investigation into a hand and shoulder injury sustained by the Veteran while in the Connecticut National Guard (CNG).

26.     Upon his arrival in Florida, the Veteran presented himself to the VA outpatient clinic in Riviera Beach with the LOD and discharge records provided him by the CNG.

27.     The Riviera Beach VA clinic denied the Veteran treatment except for a prescription refill on humanitarian grounds.

28.     The Veteran had no resources, was financially destitute, without transportation, and involved in one or more psychosocial stressors, including divorce.

29.     The Veteran, in frustration and anger, wrote a letter to President Ronald Reagan informing the President of the VA's refusal to treat him or offer assistance in evaluating his service-connected disability.[7]

30.     In 1985, the Veteran was admitted to the VAMC Newington psychiatric unit.

---

[7] Service connection was established later for the Veteran's CNG injuries.

31.     The staff treated the Veteran badly and reacted to his PTSD symptoms confrontationally.

32.     For example, the staff told the Veteran that a former Vietnam POW named William P. Taliaferro, who had been captured next to the Veteran on February 6, 1968, did not exist.

33.     The impact of this challenge to the Veteran's honesty and credibility was detrimental to his mental health condition and PTSD prognosis.

34.     As a matter of record, William P. Taliaferro was captured and taken prisoner in Vietnam on February 6, 1968.

35.     The Veteran sought the assistance of the medical center's chief of staff, Dr. John W. Boylan, who resolved many of the Veteran's issues with the staff during the remainder of his admission.

36.     In 1985, while admitted to the Newington VAMC, the Veteran was given the wrong prescription by the VA pharmacy prior to leaving on weekend pass.

37.     In 1985, the inadequacy of the VA Compensation & Pension Benefits (C&P) evaluation to determine the Veteran's award of compensation benefits required the generation of another evaluation report.

38.     This subsequent C&P evaluation resulted in a 100% service-connected disability rating for PTSD which was found to be permanent and total in 1995.

            2.      *Veteran's Fee Basis Eligibility, 1986 through 1990*

39.     The Veteran received a Fee Basis Referral dated October 1, 1986, stating that he was 100% service-connected disabled for PTSD .  (Pet. App. at A16)

40.     The fee basis services were justified as the Veteran becomes highly agitated, experiences high anxiety and high anger, when at a VA hospital.

41.     The diagnosis by the recommending physician, Dr. William Fleeson, was PTSD with weekly individual psychotherapy recommended for a six-month period.

42.     The Veteran contacted the VA Fee Basis Section on October 21, 1986, and spoke to the section chief, Louise London ("Chief London"), to inquire about his fee basis status.  (Pet. App. at A17)

43.     Chief London noted a "[q]uestion aroused by MAS [Medical Administrative Services] on how this veteran is justified to have a fee basis card."

44.     Chief London noted that the Veteran informed her during the conversation that a social worker, Tom Bracken, had spoken with the Veteran and then spoken with a VA psychiatrist, Dr. Caffrey, with the result that the VA concluded that the Veteran should be seen by a private psychiatrist because of his angry and irritated feelings directed at the VA based on previous contacts.

45.     Chief London asked Dr. Fleeson to review his October 1, 1986, Fee Basis Referral because, according to Chief London, "Im [sic] told our staff can treat a PTSD patient."

46.     The Veteran started sessions with Dr. Caffery, a psychiatrist in private practice, on a six-month VA fee-basis status after Dr. Fleeson's October 23, 1986, review and his continued recommendation of fee basis services, despite Chief London's notation that the VA had staff members who could treat PTSD.  (Pet. App. at A17)

47.     In 1987, the Veteran relocated from Connecticut to Hawaii to escape the pressures, questions, and concerns of friends and family regarding his welfare and PTSD diagnosis.

48.     In December 1987, after the Veteran unsuccessfully sought psychiatric treatment in Hawaii, he was authorized by VA offices in Washington, D.C. to enter a private psychiatric clinic between December 8, and December 11, 1987.

49.     In May 1988, the Veteran remarried and returned to Rocky Hill, Connecticut with his wife, Lois Peruta, where they continue to reside.

*3.     1990 through October 2002 Veteran's Medical Care*

50.     The VA notified the Veteran by letter dated September 28, 1990, of an annual review for veterans receiving care by private physicians to determine the continued need for outpatient care.  (Pet. App. at A18)

51.     The notice informed the Veteran that since he had not used the Fee Basis Program for more than one year, if additional medical information was not submitted for further review, he would be deleted from the Fee Basis Program effective November 30, 1990.

52.     In response to the September 28, 1990, notice, the Veteran met with VACHS Chief of Staff Dr. Patel to review the history of the Veteran's contacts with the VA.

53.     Dr. Patel determined that the Veteran's treatment at VAMCs aggravated his service-connected PTSD.

54.     A Fee Basis Referral signed by Dr. Patel on December 10, 1990, justified the continuation of fee basis services to the Veteran based upon three extenuating circumstances for hardship: (1) In-house patient management problems (behavioral); (2) Patient becomes extremely tense when coming into VA hospitals; and (3) Patient cannot deal with coming into hospital.

55.     Dr. Patel noted the "Current Synopsis of Care" as: (1) PTSD (Diagnosis); (2) Fee Basis for PTSD (Treatment); and (3) Recommend and approve any and all medical treatment not just PTSD (Type of fee basis care).

56.     The frequency of medical care was to be any and all medical treatment not just PTSD.

57.     A three-year review was recommended.  (Pet. App. at A19)

58.     In 1991or 1992, against Dr. Patel's treatment advice, the Veteran visited the Newington VAMC for a hearing test accompanied by his wife for support.

59.     The test results showed that the Veteran had sustained hearing loss that could be attributed to excessive exposure to gunfire while in combat.

60.     The VA advised the Veteran to monitor his hearing and to expect additional loss.

61.      He was told by the VA that his need for hearing aids was "borderline."

62.     In January 1993, against Dr. Patel's treatment advice but in response to threats from the VA that he would lose his VA compensation, the Veteran presented himself to Dr. Fleeson at the Newington VACHS for a C&P psychiatric evaluation.

63.     During this visit, again accompanied by his wife for support, the Veteran experienced extreme pressure and duress with feelings of high anxiety, anger, and distrust.

64.     When the Veteran attempted to update the address on his VA medical card during this visit, a staff member confiscated the card claiming that the Veteran was 70%, not 100%, service-connected disabled.

65.     The Veteran became so distressed that VA police officers responded to the scene.

66.    The issue was resolved when the VA admitted its error founded in an inefficiency between its administration and medical computer systems that resulted in one system showing a different disability rating than the other system.

67.    The VA reissued the Veteran a medical card showing 100% disability.

68.    On December 12, 1993, against Dr. Patel's treatment advice, the Veteran sought help from the West Haven VACHS but was allowed to leave, intoxicated, during the night in sub-freezing weather until he was picked up by his wife at a gas station near I-91 in North Haven, Connecticut.

69.    Sometime during or near 1994, the Veteran, while visiting Key West, Florida, with his family, became extremely anxious and, against Dr. Patel's treatment advice, sought medication and anxiety relief from a VA outpatient clinic where a VA staff member then attempted to confiscate the Veteran's fee basis card.

70.    In 1994, Dr. Gary Sigafoos performed periodontal work for the Veteran and received payment from the VA based on the Veteran's fee basis status.

71.    In January 1995, during a federal civil trial in Bridgeport, Connecticut, the Veteran, against Dr. Patel's treatment advice, was admitted to the West Haven VACHS psychiatric unit for anxiety.

72.    The unit's treating psychiatrist encouraged the Veteran to assist other patients with their VA claims.

73.    After the Veteran's discharge, the unit psychiatrist continued to provide the Veteran's name and contact information to other veterans needing assistance with their claims.

74.    In 1995, an attorney representing a party in a proceeding adversarial to the Veteran informed the Veteran that a paralegal at his firm, Halloran & Sage, had received

confidential information from her husband, who worked at the VA and was assigned the Veteran's claim.

75.     The attorney, Michael Gustafson, currently an Assistant U.S. Attorney in the District of Connecticut, told the Veteran that the paralegal had offered to obtain information from her husband for use against the Veteran in the federal civil trial.

76.     In 1997, the Veteran, against Dr. Patel's treatment advice, presented himself to the West Haven VAMC following an off-road motorcycle accident with pain in his right leg fibula and chest.

77.     The VA discharged the Veteran with assurances that he had not suffered injury.

78.     The Veteran, in severe pain, was seen by Dr. Raycroft on May 13, 1997, who, after viewing x-rays, informed the Veteran that the Veteran had a fracture of the fibular in his right leg and possible broken ribs or cartilage in his chest.

79.     The x-rays revealed an undisplaced proximal fibular fracture.

80.     In April 1997, the Veteran, against Dr. Patel's treatment advice, sought treatment at the West Haven VAMC for dental problems related to the motorcycle accident and was told that there was no injury.

81.     The Veteran then sought treatment from a private dental surgeon who advised the Veteran that he had exposed jaw bone fragments protruding from his lower left gum.

82.     On April 5, 1999, at the request of family and friends, the Veteran had the first of two hearing tests performed by Dr. Jeffrey Sawyer in Glastonbury, Connecticut.

83.     On December 2, 1999, the Veteran, against Dr. Patel's treatment advice, was evaluated at the West Haven VAMC following three days of chest pains.

84.     The VA contacted the Veteran's wife after being told specifically by the Veteran not to do so.

85.     In 2002, the Veteran, against Dr. Patel's treatment advice but continuing to suffer from severe periodontal pain, sought treatment at the Newington VAMC, which referred the Veteran for fee basis services to Barry J. Gelber, DDS ("Dr. Gelber") in Wethersfield, Connecticut.

86.     Dr. Gelber recommended dental implants for the lower front jaw and when asked by the Veteran about a bridge for the lower jaw rather than implants, Dr. Gelber advised against the bridge and explained that implants were the long-term solution.

87.     The Veteran was told by Dr. Lewis at the Newington VAMC that the VA did not treat with implants and would create a bridge as the only VA option.

88.     The Veteran suffered a heart attack on October 29, 2002.

    4.     *November-December 2002 VA Internal Emails*

89.     On November 14, 2002, VACHS Fee Basis Voucher Examiner Alice Lebrun ("Ms. Lebrun") emailed VA Registered Nurse Susan Dicker ("Nurse Dicker") informing Nurse Dicker that a cardiologist's office had contacted Ms. Lebrun to determine if the VA would pay for the Veteran's cardiac rehabilitation.

90.     Ms. Lebrun informed the cardiologist's office that the VA did not pay for cardiac rehabilitation.

91.     Ms. Lebrun told Nurse Dicker that the Veteran may be contacting Nurse Dicker and characterized her notice to Nurse Dicker as a "heads up."  (Pet. App. at A20)

92.     On November 15, 2002, Nurse Dicker thanked Ms. Lebrun for the "heads up" and asked whether the Veteran's fee basis card for "all conditions" was being evaluated because of the Veteran's refusal to be seen at the VA or elsewhere for PTSD.

93.     According to Nurse Dicker, Dr. Jeffrey S. Lustman did not believe the fee basis card was justified and Nurse Dicker agreed, telling Dr. Lustman that the Veteran's fee basis card warranted a review.  (Pet. App. at A20)

94.     Nurse Dicker described the Veteran to Dr. Lustman as a "gentleman who had a fee basis card for 'all conditions' – since coming to any VA hospital causes him anxiety based on past experiences."

95.     Nurse Dicker then continued to observe that the Veteran "*is aging* and recently had an angioplasties x2 at a non-VA hosp, and expected the VA to pay."  (italicized emphasis added).

96.     According to Nurse Dicker, the Veteran's "***eligibility for the card really needs review - as he will be very expensive for us in the future as he ages.***"  (emphasis added).  (Pet. App. at A20)

97.     Still unsure of his role in the discussion, Dr. Lustman responded:

Not sure how big my part in this is. I understand my role as simply confined to judgements [sic] about mental health services, not over all card use (except when someone is fee based for mental health and a question of other services arises). So for my part, he is not fee based for mental health services and we are not inclined to change that status.

98.     In response, Nurse Dicker indicated her intent to forward Dr. Lustman's email to the Chief, Finance/Patient Fee Services Joseph LaMadeleine.

99.    Ms. Lebrun told Nurse Dicker that she would send a letter to the Veteran informing him that he would not be covered for his PTSD and warned that because the Veteran was rated Permanent and Total in 1995, he would "likely contact his congressman."

100.    Ms. Lebrun related further that the Veteran could be quite loud and react sporadically.

101.    Dr. Lustman offered that Ms. Lebrun obviously spoke from "battle weary experience" and told her to field all inquiries, including from the Veteran or congressmen to Dr. Lustman.  (Pet. App. at A21)

102.    On November 19, 2002, Chief LaMadeleine asked Ms. Lebrun what the Veteran was "originally put on the fee card program for?" and "[w]hen does his card status come up for review?"

103.    Ms. Lebrun informed Chief LaMadeleine that the Veteran was issued a fee basis card for PTSD in 1986, then made applicable to all medical conditions in 1990 as recommended and signed to by Dr. Patel.  (Pet. App. at A21)

104.    Ms. Lebrun told Chief LaMadeleine that the Veteran's fee basis card was currently scheduled for review and due to expire on October 31, 2002, and that Dr. Lustman would perform the psychiatric review and Dr. Waterman the medical review, as required.

105.    Chief LaMadeleine indicated that the Veteran would be scheduled for an appointment.  (Pet. App. at A22)

106.    Chief LaMadeleine acknowledged that the reason the Veteran was issued a fee basis card for all conditions was due to his psychiatric condition which prevented him from seeking treatment at VA facilities, however Chief LaMadeleine thought the Veteran should be reevaluated as he was no longer being treated for a psychiatric condition.   (Pet. App. at A23)

107.   Chief LaMadeleine, Dr. Lustman, Nurse Dicker, and Ms. Lebrun then engaged in a protracted conversation regarding how the Veteran should be informed that his fee basis status would be terminated.

108.   Dr. Lustman suggested that the Veteran be informed that his fee basis was being terminated because there is no one else on the "fee list (to the best of my [Dr. Lustman's] knowledge) who claims to be unable to receive care at the VA for reasons like his [the Veteran's]."

109.   Chief LaMadeleine recognized that the Veteran would oppose the termination of his fee basis status and recommended that the VA perform a reevaluation to support its decision.

110.   According to Chief LaMadeleine the question was whether the Veteran's diagnosis prevented him from successful treatment at VA facilities to which Dr. Lustman absent any evaluation or record review answered, "no."

111.   Ms. Lebrun suggested that Dr. Lustman or Nurse Dicker contact the Veteran.

112.   Dr. Lustman was willing to contact the Veteran and believed it important that the Veteran be informed that the "arrangement was flawed from the beginning."

113.   Nurse Dicker conveyed a conversation she had with the Veteran following his emergency angioplasty at Hartford Hospital when she gave the Veteran "unofficial warning" that his fee basis card for all conditions would be reevaluated.

114.   Dr. Lustman joked, "Well ... I've had to do less sensible things (sigh). What's his number?"  (Pet. App. at A24)

115.   On December 4, 2002, Nurse Dicker asked if Dr. Lustman was "alive and well?" to which Dr. Lustman responded that he was but would "re enter the den this afternoon."

116.    Nurse Dicker wished him "**GOOD LUCK! ! ! !**"  (Pet. App. at A24) (bold emphasis in original).

117.    Dr. Lustman contacted the Veteran on December 6, 2002, and confirmed the Veteran's agreement to an evaluation.

118.    Dr. Lustman asked Dr. Ben Hur Mobo, Jr. to:

> [S]et up a C&P exam to review Mr Peruta's PTSD and determine if his contention that he is unable to obtain his healthcare at the VA is credible. Since he is not treated for his PTSD. we have no current assessment we can turn to. Could you please facilitate this?

119.    Dr. Mobo had no comment as of December 12, 2002, which was followed, without apparent explanation, by Dr. Lustman's determination on December 17, 2002, that he would send the issue to the Chief of Staff's office as "that office has now taken over all review /approval functions for Psych Fee Basis."

120.    Dr. Lustman then clarified for Ms. Lebrun that he had "not been taken out of the loop" and would still receive communications from Ms. Lebrun to forward the VACHS Chief of Staff Michael H. Ebert.  (Pet. App. at A25)

121.    Dr. Lustman then informed Ms. Lebrun that he had arranged a C&P Benefits evaluation for the Veteran who would be contacted by Dr. Mobo.

122.    Nurse Dicker received a voicemail message from the Veteran and was "procrastinating" in returning the call.  (Pet. App. at A26)

123.    On December 19, 2002, the Assistant to the Chief of Staff, Paul Mulinski, contacted Ms. Lebrun to inform her that the VACHS did not provide cardiac rehabilitation services, Dr. Ebert had met with the Veteran,[8] and to approve the Veteran's fee basis referral.

---

[8] Dr. Ebert trained in psychiatry at two of the Harvard Medical School residency programs (Massachusetts Mental Health Center and Massachusetts General Hospital).  He is a Director of the American Board of Psychiatry and

124.    Dr. Lustman asked whether the Veteran retained "full card access as before" and whether to proceed with "or cancel the plan for a PTSD re-evaluation?"

125.    Assistant Chief of Staff Mulinski told Dr. Lustman that the matter would be readdressed upon Dr. Ebert's return since Dr. Ebert had met with the Veteran. (Pet. App. at A27)

126.    Ms. Lebrun, responsive to an email not provided wrote on December 19, 2002:

> NO, he is not. I have been paying for his medical visits. Mr. Peruta has not abused his fee card in any way. He will contact this office if he has any questions regarding treatment or visits or medications. He has always been very up front and to the point, and in return we in fee have tried to be that way with him.

(Pet. App. at A26)

127.    Assistant Chief of Staff Mulinski asked how the Veteran would be informed he was approved for fee basis services.  When Dr. Lustman asked to speak directly with Assistant Chief of Staff Mulinski to avoid confusion, Mr. Mulinski denied being confused.  Dr. Lustman responded:

> Good, Paul. Then you can enlighten me. Was the patient just approved for the current expenses of his care or did the chief of staff mean to approve his fee card for future use as well. The original concern before Mike met with the patient was that his PTSD has not been either treated or evaluated in a good long while so the whole basis for his fee card is not on very solid ground. We thought that there needed to be a review of his basic condition before approving his fee card use. Shall I go ahead with this review or not?

128.    In the next communication, after apparently speaking to Mr. Mulinski, Dr. Lustman tells Dr. Mobo: "Just spoke to Paul Mulinski and in light of new information, it makes the most sense at this point to call off the PTSD review and leave all this alone."  (Pet. App. at A27)

---

Neurology and also serves on the Residency Review Committee for Psychiatry of the Accreditation Council on Graduate Medical Education (ACGME). See http://www.connecticut.va.gov/staff.asp.

129.    In January 2004, the VACHS printed the chain of sixty-four November – December 2002 emails exchanged among Ms. Lebrun, Nurse Dicker, Dr. Lustman, Mr. Mulisnki, and Dr. Mobo and placed them in the Veteran's file.  (Pet. App. at A20-A27)

130.    In a May 15, 2009, Request for Outpatient Services (ROS) the period of validity for the Veteran's fee basis card indicated the time period October 23, 1986, through October 15, 2009.  (Pet. App. at A32-A33)

131.    In the authorization remarks which follow, the ROS states:

> All medical conditions considered.  Mr. Peruta put on fee basis per Washington, D.C.  Approved by Dr. Waterman though 10-15-09. All conditions considered.  Mr. Peruta will be covered for med & psyc bills incurred from 10-31-02 thru re evaluation of veteran (10-15-09) Review sent out to Dr. Polukas in September, returned to VA on 10-15-08.  App'd by Dr. Ebert for addt'l year.

132.    During this period in May-June 2009, the Veteran was informed by Ms. Lebrun that the VA would be attempting to revoke, deny, or somehow terminate his fee basis status. (Pet. App. at A34, A35)

133.    The Veteran met with Ms. Lebrun and Dale Gaudio, the VA Business Office Manager to discuss his fee basis status.

134.    Following the meeting, the Veteran asked Ms. Lebrun to memorialize this contact in the Fee Basis Section systems and a Report of Contact (ROC) was generated by Ms. Lebrun and sent to the Veteran and his wife with a handwritten note from Ms. Lebrun.

135.    Ms. Lebrun reported that the Veteran was on fee basis status for "all conditions" considered, and was authorized via Washington, back in the early 90's."  (Pet. App. at A34, A35)

136.    When the Veteran, relying on Ms. Lebrun's June 1, 2009, ROC and all the documents preceding it, informed the VA in 2010 that he was fee basis status for all conditions, the Veteran was told that Ms. Lebrun had been "fired."

5.      *2002 through 2009 VA Contacts and Fee Basis Services*

137.    In May 2003, Dr. John Waterman, Acting Co-Director, Primary Care Service Line, was informed by the Fee Services Section that the Veteran was approved for a heart stent procedure on fee basis status at Hartford Hospital for May 6, and May 7, 2003.

138.    The memorandum noted "behavioral problem" and commented: "This veteran remains the exception to the rule."

139.    In February 2004, the Veteran submitted a claim for service-connected disability compensation for hearing loss, tinnitus, and GERD.

140.    Prior to 2004, the Veteran had been unable to obtain VA life insurance because he had not applied within one year of receiving his 100% disability rating in 1985.

141.    During this claims process, the Veteran learned that the VA had been unable to locate the results of the hearing tests performed at the VA in 1991.

142.    The VA tested the Veteran's hearing on April 4, 2005.

143.    The Veteran also had results from a second hearing test performed on July 27, 2004, by Dr. Sawyer in Glastonbury, Connecticut.

144.    After making the appointment with Dr. Sawyer, the Veteran recalled that he had been tested at that same office in 1999.

145.    Dr. Sawyer's results from the hearing test on July 27, 2004, were consistent with the test he performed in 1999 but different from the VA's April 4, 2005 test result.

146.    The VA awarded the Veteran a rating for service-connected disability for hearing loss based on the tests conducted by Dr. Sawyer in 1999 and 2004.

147.    The Veteran filed a complaint with the VA regarding the deceptive April 4, 2005, VA hearing test.

148.    The establishment of the service-connected hearing loss through the hearing tests conducted by a private physician allowed the Veteran to obtain VA life insurance.

149.    While the 2004-2005 claims process for service-connected hearing loss compensation proceeded, a tooth in the Veteran's lower jaw broke free of the bone.

150.    Due to the unavailability of the Veteran's two treating private dentists, Dr. Gelber and Dr. Mandel, he was privately referred to another dentist, Dr. Jay Goldstein, who saw the Veteran, treated the emergency issue with an adhesive patch to the broken tooth, and recommended dental implants.

151.    While in the Dominican Republic in 2005 subsequent to the emergency dental treatment, the same tooth temporarily repaired by Dr. Goldstein broke loose.

152.    The Veteran immediately flew to Miami to seek treatment, against Dr. Patel's treatment advice, at the Miami VAMC Dental Clinic where he was told that the he needed dental implants.

153.    The VACHS had led the Veteran to believe that VAMCs, system-wide, did not install dental implants.

154.    The Veteran contacted the VACHS by phone from Miami and flew to Connecticut the next day where he was told that since the VACHS did not have a dentist on staff performing dental implant surgery, the Veteran was authorized for the procedure on fee basis.

155.    The Veteran's feelings of anger and distrust regarding the treatment at VAMCs were confirmed further.

156.    In March 2007, the Veteran, against Dr. Patel's treatment advice, presented himself to the San Diego VAMC to provide notice of his fee basis status and his plan to be away

from Connecticut and in San Diego approximately six months each year during the winter months.

157.    The San Diego VAMC refused to recognize the Veteran's fee basis card and insisted that he register in the San Diego VA system.

158.    In March or April 2007, the Veteran, against Dr. Patel's treatment advice, sought to obtain hearing aids at the Newington VAMC Audio Clinic.

159.    The clinic staff member refused to assist the Veteran while the Veteran's well-behaved toddler granddaughter was present so the Veteran left and obtained hearing aids from a private Ear, Nose, and Throat Specialist.

160.    In 2007, the Veteran attempted contact by phone and email with Dr. Mark Braithewaite, Chief of the Dental Clinic at the Newington VAMC to express his frustration at a lack of response to his messages.

161.    Dr. Braithewaite had requested that the Veteran be examined and x-rays taken at the Newington VAMC Dental Clinic when x-rays were already available through the Veteran's private dentist.

162.    During the Veteran's visit to the Newington VAMC Dental Clinic, he was told by the dental hygienist cleaning his teeth that he should not complain about the clinic's decisions or treatment because the care he was receiving was "free."

163.    The Veteran spoke to a supervisor about the insulting and untrue comment made by the dental hygienist and the Veteran was informed that his choice of words was not appreciated.

6.     *2009-2010 Fee Basis Termination*

164.    The VA records numbered 1-26 in the Table of Contents to the Appendix, the emails transmitted from June 22, 2010, through February 11, 2011, and the Affidavits and documents submitted by the Veteran, also contained in the Appendix, are evidence that the VA Healthcare System is incapable of repairing the lack of trust issues developed during the thirty-eight (38) year period of contact between the Veteran and the VA Healthcare System.

165.    As demonstrated by the events of October 29, 2010, the VA Healthcare System fears the Veteran, going so far as to convey this fear by a show of armed police presence, intensifying the symptomatic service-connected PTSD disability that the Veteran manages as long as he remains free of contact with the VA Healthcare System.

166.    Then, as confirmation that the armed police presence was unwarranted and only produced at the request of a Patient Advocate Supervisor serving at the VAMC medical and administrative staff's command, the VA Police Service failed to draft a report of the incident and, instead, made a journal entry four or more hours subsequent to the dispatch only when the Veteran discovered that the police were dispatched by the Patient Advocate Supervisor in anticipation of his arrival upon VA property.  (Pet. App. at A23)

C.     The Veteran has a Clear and Indisputable Right

167.    The Veteran is entitled to a fee basis card and fee basis services for all conditions based on the twenty-four (24) year duration of his entitlement, the VA Healthcare System's unclean hands, the lack of trust between the provider (VA) and the patient (Veteran), and the harmful impact of the VA medical providers' and staff's fear of the Veteran on the Veteran's service-connected PTSD disability.

168. This entitlement was confirmed in a decision of the Board of Veterans Affairs dated April 4, 2014, (Case No. 11-21 722) finding:

> Accordingly, the October 15, 2009, denial of eligibility for a fee basis medical identification card was improper. Therefore, the Veteran is eligible for and entitled to a fee basis medical identification card for any and all medical treatment for which he would normally be qualified as a Veteran.

169. The judge ordered the restoration of the Veteran's entitlement to a fee basis card on April 4, 2014.

170. The Veteran contacted the VA Region I Office of General Counsel by letter dated May 20, 2014, stating in part:

> In violation and contempt of this Order, Department of Veterans Affairs Secretary Eric Shinseki (" Secretary") has failed to issue the Veteran a medical identification card or reimburse the Veteran and his providers for medical expenses incurred from October 15, 2009, when the VA without notice to the Veteran or opportunity to be heard decided that the Veteran's entitlement to fee basis had "expired." In fact, the Secretary has withheld any formal acknowledgement to the Veteran of the Order in the 46 days since it issued from the Board. … In the 46 days since the Board Order issued in his favor the Secretary has failed the Veteran, again, and demonstrated no less than a contemptuous non-response to a Board Order.

171. The Region I Office of General Counsel contacted the Veteran's attorney by email and then spoke to Veteran's counsel on May 29, 2014,

172. The VA restored the Veteran's fee basis card and entitlement on July 18, 2014, nearly five years after the entitlement had been taken without notice, opportunity for hearing, or medical basis.

173. The VA knowingly and intentionally avoided the administrative requirements to extend or terminate the fee basis of the Veteran.

174.     In the months leading up to October 2009, the VA knowingly and intentionally failed to schedule the mandated review and evaluation of the Veteran's medical and psychological need to receive all medical services from outside providers.

175.     The VA knowingly and intentionally avoided the requirement to notify the Veteran that his fee basis status had been terminated in October of 2009.

176.     By concealing the termination of the Veteran's fee basis status, the Veteran was denied his right to seek a timely administrative appeal of the decision to allow the fee basis status to lapse.

177.     The decision to allow the Veteran's fee basis to lapse is evidenced by comments contained in emails and records obtained during the investigation in preparation for filing a request for extraordinary relief with the U.S. Court of Veterans Appeals.

178.     The Secretary approved equitable relief for the Veteran in June 2015 after the Veteran and his counsel met with VA Deputy Assistant General Counsel Susan Blauert at 810 Vermont Avenue in Washington, D.C.

179.     The Veteran submitted a claim for damages to the VA on February 28, 2015, that is attached and incorporated into this complaint.

180.     The VA acknowledged receipt on March 10, 2015, of the Veteran's claim by letter dated March 20, 2015, referencing the claim as Claim #10247.

181.     The Veteran contacted the VA on June 22, 2016, to request information about the status of his claim.

182.     The VA informed the Veteran on June 22, 2016, that his claim had been denied.

183.     In a letter dated June 22, 2016, the Veteran's counsel requested that the VA forward the denial by fax or email immediately so that there would be no delay in filing an action within 6 months of the denial.

184.     In addition, the Veteran's counsel asked the VA to provide the tracking number for the registered or certified mailing of the denial to facilitate an investigation of the reason why the denial had not been received.

185.     The VA faxed a denial dated August 27, 2015, referencing Claim #10246.

186.     The claim number assigned by the VA in its letter dated March 20, 2015, acknowledging the Veteran's claim was 10247.

187.     The Veteran did not receive the August 27, 2015, denial until June 22, 2016, when it was faxed to the Veteran's counsel after the Veteran contacted the VA to request information about the status of his claim.

188.     The VA never provided a tracking number for the mailing of the August 27, 2015, denial despite the notation of Certified Mail on the denial.

189.     Previously, when the Veteran submitted his BVA appeal (Case No. 11-21 722) on April 25, 2011, to the VA medical center in Newington, CT by priority mail the VA lost the appeal even though the Veteran was able to show that the appeal had been delivered and signed for at the VA.

190.     The loss of the appeal was discovered after the Veteran called the VA to get information about the status of his BVA appeal and the Newington VACHS told the Veteran that no appeal had been received and therefore no appeal existed regarding the Veteran's termination of fee basis status.

191.    The Veteran obtained proof from the U.S. Postal Service showing the date and time that the BVA appeal was delivered to the VA and the signature of the receiving party at the Newington VACHS.

192.    After submission of the evidence provided by the U.S. Postal Service, the Veteran submitted a formal complaint regarding the loss, theft or destruction of the BVA appeal to VA Chief Privacy Officer Nancy Katz-Johnson who never properly and seriously addressed or investigated the loss, theft, or destruction of the BVA appeal.

## CAUSES OF ACTION

### Count 1
### Negligence Against The United States of America

193.    The Veteran realleges and reincorporates each and every allegation above as if fully set forth herein.

194.    The Defendan had a duty to provide ordinary care, and to exercise that standard and degree of care and skill required of health care providers, consistent with the expertise that the Defendant presented to the community at large.

195.    The Defendant breached its duty of care to the Veteran.

196.    At all times relevant to this Complaint, the Defendant had a duty to hire competent operators, administrators, employees, agents, and staff in order to meet its standards of quality of care of its patients, including the Veteran.

197.    The Defendant knew, or should have known, that the medical staff of the facility was not properly trained, and/or supervised, in a manner necessary to provide a level of care for the Veteran that met all applicable legal requirements; that demonstrated the standard and degree of care and skill required of competent health care providers; and was consistent with the expertise that the Defendants presented to the community at large.

198.    The Defendant breached its duty by negligently hiring incompetent, inexperienced and/or unqualified operators, administrators, employees, agents and staff in order to meet its standards of quality of care of its patients including the Veteran.

199.    The Defendant knowingly and intentionally ignored the medical decisions made to place that the Veteran in a fee basis status.

200.    The Veteran's fee basis status was awarded on medical and psychological grounds by various medical doctors and was protected from any decisions to terminate same without new medical or psychological evidence to support the decision.

201.    Records contained in the Veteran's medical files memorialize decisions that were made in 1986, 1990 and 2002 to keep the veteran in a fee basis status for "ALL MEDICAL CONDITIONS".

202.    The referenced records evidence the fact that various VA doctors and administrative personnel engaged in verbal and written discussions in an attempt to terminate the Veteran's fee basis status for financial reasons without the proper medical justification.

203.    VA personnel conspired, discussed and used their personal non-medical opinions to knowingly and intentionally permit the veteran's fee basis status to lapse in October of 2009.

204.    The record will reflect that the veteran was never informed that is fee basis status had lapsed, and only found out when informed by a medical provider in the spring of 2010.

205.    The Defendant breached its duty by negligently retaining incompetent, inexperienced, unqualified and/or inadequately trained operators, administrators, employees, agents and staff.

206.    As a direct and proximate result of the Defendant's negligence, the Veteran sustained serious and permanent personal injuries in and about his body; he has incurred medical

expenses, and other damages, and will continue to incur medical expenses, and other damages in the future; he was forced to endure pain, suffering and mental anguish, and will continue to endure pain, suffering, and mental anguish in the future; he has suffered the loss of enjoyment of life, and will continue to suffer a loss of the enjoyment of life in the future; and he has lost wages, and will continue to lose wages in the future.

207.    The acts and/or omissions set forth above would constitute a claim under the law of the State of Connecticut.

208.    The Defendant is liable pursuant to 28 U.S.C. § 1346(b)(1).

**Count 2**
**Vicarious Liability, Respondent Superior, Ostensible Agency And/Or Agency**

209.    The Veteran realleges and reincorporates each and every allegation above as if fully set forth herein.

210.    At all times relevant to this case, the Defendant directors, officers, operators, administrators, employees, agents, staff were employed by and or acting on behalf of the Defendants.

211.    At all times relevant to this case, the directors, officers, operators, administrators, employees, agents, staff acted within their respective capacities and scopes of employment for the Defendants.

212.    The Defendant directors, officers, administrators, employees, agents and/or staff negligently and/or recklessly, directly and proximately caused personal injury to the Veteran, including both acts of omission and acts of commission.

213.    As a direct and proximate result of Defendant's negligence, the Veteran sustained serious and permanent personal injuries in and about his body; he has incurred medical expenses, and other damages, and will continue to incur medical expenses, and other damages in the future;

28

he was forced to endure pain, suffering and mental anguish, and will continue to endure pain, suffering, and mental anguish in the future; he has suffered a loss of the enjoyment of life, and will continue to suffer a loss of enjoyment of life in the future; and he has lost wages, and will continue to lose wages in the future.

214.    The acts and/or omissions set forth above would constitute a claim under the law of the State of Connecticut.

215.    The Defendant is liable pursuant to 28 U.S.C. § 1346(b)(1).

## Count 3
### Violation Of Due Process

216.    The Veteran realleges and reincorporates each and every allegation above as if fully set forth herein.

217.    The Defendant denied the Veteran opportunity for notice and hearing prior to the termination of his fee basis status in October 2009.

218.    The Defendant justified its decision to terminate the Veteran's fee basis status based on an administrative rather than medical decision when the justification for the Veteran's fee basis status was a medical diagnosis of PTSD.

219.    The denial of due process in violation of the Fourteenth Amendment to the United States Constitution caused the damages to the Veteran described under Counts 1, 2, 4, and 5.

## Count 4
### Intentional Infliction of Emotional Distress

220.    The Veteran realleges and reincorporates each and every allegation above as if fully set forth herein.

221.    The Defendants knew or should have known that emotional distress was the likely result of their extreme and outrageous conduct in unlawfully terminating his fee basis status then losing the Veteran's BVA appeal and seeking to delay the Veteran's relief.

222.    The Defendants' were the cause of the Veteran's distress.

223.    The emotional distress sustained by the Veteran's has been severe.

224.    The Veteran has suffered severe emotional distress and seek compensatory and punitive damages.

## Count 5
### Negligent Infliction of Emotional Distress

225.    The Veteran realleges and reincorporates each and every allegation above as if fully set forth herein.

226.    The Defendants created an unreasonable risk of causing the Veteran emotional distress by unlawfully terminating his fee basis status then losing the Veteran's BVA appeal and seeking to delay the Veteran's relief.

227.    The Veteran's distress was foreseeable.

228.    The Veteran's distress was severe enough that it might result in illness or bodily harm.

229.    The Defendants's conduct was the cause of the Veteran's distress.

230.    The Veteran has suffered distress severe enough that it might result in illness or bodily harm and seek compensatory and punitive damages.

PLAINTIFF/VETERAN
EDWARD A. PERUTA

BY: _____

Rachel M. Baird
Rachel M. Baird & Associate
15 Burlington Road
Harwinton, CT 06791
Tel: (860) 605-9340
Fax:  (860) 605-9343
Email:  rbaird@rachelbairdlaw.com